JACK KAUFMAN (NY Bar No. 2348696)
MICHAEL ELLIS (NY Bar No. 4775672)
PRO HAC VICE APPLICATIONS PENDING
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
Email:  KaufmanJa@sec.gov
Telephone: (212) 336-0106
Facsimile: (212) 336-1319

LOCAL COUNSEL:
STEPHEN KAM (Cal. Bar. No. 327576)
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Email: KamS@sec.gov
Telephone: (323) 302-7465
Facsimile: (213) 443-1904

Attorneys for Plaintiff
Securities and Exchange Commission

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | Case No. 2:23-cv-3682 |
| Plaintiff, | **COMPLAINT** |
| vs. | |
| RED ROCK SECURED, LLC, SEAN KELLY, ANTHONY SPENCER, AND JEFFREY WARD, | **DEMAND FOR JURY TRIAL** |
| Defendants. | |

COMPLAINT                              1

Plaintiff Securities and Exchange Commission ("Commission" or "SEC"), for its Complaint against Defendants Red Rock Secured, LLC ("Red Rock"), Sean Kelly ("Kelly"), Anthony Spencer ("Spencer"), and Jeffrey Ward ("Ward") (collectively, "Defendants"), hereby alleges as follows:

## JURISDICTION AND VENUE

1.      The SEC brings this action pursuant to Sections 21(d) and 21(e) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§78u(d) and 78u(e)], and Section 209(d) of the Investment Advisers Act of 1940 ("Advisers Act") [15 U.S.C. § 80b-9(d)].

2.      This Court has jurisdiction over this action pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14], and 28 U.S.C. § 1331.

3.      Venue is proper in this Court pursuant to Section 27 of the Exchange Act [15 U.S.C. § 78aa] and Section 214 of the Advisers Act [15 U.S.C. § 80b-14].  Acts, practices and courses of business constituting violations alleged herein have occurred within the jurisdiction of the United States District Court for the Central District of California and elsewhere.

4.      Defendants directly and indirectly made use of the means and instrumentalities of interstate commerce and of the mails in connection with the acts, practices, and courses of business alleged herein, and will continue to do so unless enjoined.

## SUMMARY

5.      From January 2017 through at least June 2022 (the "Relevant Period"), Red Rock, its Chief Executive Officer, Sean Kelly, and two of its Senior Account Executives, Anthony Spencer and Jeffrey Ward, while acting as unregistered investment advisers, persuaded hundreds of retirement account investors to sell their existing securities, transfer the proceeds into self-directed individual retirement accounts ("SDIRAs") that Red Rock helped clients establish, and invest the proceeds

in gold or silver coins.  They did so by making false and misleading statements, including regarding the markups that Red Rock charged on the price of coins, the purported value of "premium" coins, and the performance of the stock market.

6.     Defendants targeted investors who held securities in retirement accounts, including in the federal government employee Thrift Savings Plan ("TSP"), 401(k) accounts, and individual retirement accounts ("IRAs").  Defendants solicited investors through numerous marketing materials, email campaigns, and telephone calls in which they made dire statements, some of which were false and misleading, warning that the investors' existing securities holdings faced imminent and serious risk of losses.  Defendants told investors that they could protect their assets from the losses posed by stock-market risk through diversification by converting their securities into gold and silver—and, in particular, coins sold by Red Rock—which Defendants misleadingly promoted as tangible assets that would always have value and typically increase in value.

7.     Red Rock employees, including frequently its top sales executives, Spencer and Ward, regularly advised prospective clients to sell securities and use the proceeds to purchase metal by stating that Red Rock charged one to five percent above its cost for "common bullion" assets.  They did not disclose, however, that the "premium" coins that Red Rock advised investors to purchase had a much higher markup: typically 120 to 130 percent above Red Rock's cost to acquire the coins. Moreover, a transaction agreement that Red Rock provided to clients contained misleading language that indicated Red Rock charged a maximum of 29 percent above its cost for "premium metals."

8.     In advising prospective clients and clients to purchase "premium" coins, Red Rock employees, including Spencer and Ward, also falsely and misleadingly stated that such coins had a market value that was substantially higher than the asset value reported by SDIRA custodians and that the market value was determined by purported demand factors.  In fact, the purported market value of the "premium"

coins was not driven by external demand but instead, was solely determined by the Defendants.

9.   Thus, directly contrary to Defendants' representations, Defendants' fraudulent scheme was designed to lure investors away from relatively liquid retirement account investments with well-defined and clearly-reported market values, to invest instead in Red Rock "premium" coins—the value of which, as reported by the SDIRA custodians, was well below the purchase prices clients paid to Red Rock.

10.   During the Relevant Period, Red Rock sold "premium" coins to at least 700 clients, for a total of more than $50 million.  To fund the purchase of those coins, the 700 clients sold securities in their TSPs, IRAs, and other retirement accounts; transferred more than $50 million in sale proceeds to SDIRAs with Red Rock's assistance; and purchased the coins from Red Rock through their SDIRAs at Red Rock's repeated urging and with its advice.  Though Red Rock advised prospective clients and clients to sell securities and buy Red Rock coins in order to "protect" their retirement savings and "enjoy a worry free retirement," Red Rock in fact pocketed more than $30 million of the funds investors paid for the "premium" coins.  This upfront markup, or profit above Red Rock's cost to acquire the coins, immediately put clients in a hole and significantly depleted the very retirement assets that Red Rock had advised clients to "protect."

11.   The SEC brings this lawsuit to protect the investing public and to hold Defendants accountable for their misconduct.

## DEFENDANTS

12.   Red Rock Secured, LLC is a Nevada limited liability company with its principal place of business in El Segundo, California.

13.   Sean Kelly, age 46, resides in Porter Ranch, California.  He has been the Chief Executive Officer of Red Rock since January 2017.  Kelly owns 80% of Red Rock's Class A voting shares and controls the company's operations and decision-making.  In addition to receiving a salary, Kelly received compensation in the form of

1    distributions from the profits Red Rock made from selling metal to clients.

2          14.    Anthony Spencer, age 52, resides in Los Angeles, California.  He was a

3    Senior Sales Executive with Red Rock from in or around July 2018 to August 2022.

4    Spencer also held the title of Director of Account Services during that time.  In

5    addition to receiving a 3.5% share of Red Rock's profits, Spencer received

6    compensation in the form of commissions.

7          15.    Jeffrey Ward, age 44, resides in Playa Vista, California.  He was a

8    Senior Sales Executive with Red Rock from in or around January 2017 to September

9    2022.  Ward also held the title of Director of IRA Services during that time.  In

10   addition to receiving a 3.5% share of Red Rock's profits, Ward received

11   compensation in the form of commissions.

12   **FACTS**

13      **A.**    **Defendants Targeted Investors with Retirement Accounts Holding**

14           **Securities.**

15         15.    During the Relevant Period, Red Rock, at Kelly's direction, as well as

16   frequently with the help of Spencer and Ward, solicited business through numerous

17   email campaigns, digital newsletters and advertisements targeting investors who held

18   securities in retirement accounts such as 401(k)s, IRAs and TSPs.

19         16.    Red Rock sent emails soliciting business to millions of individuals per

20   month, including to those who had subscribed to stock and mutual fund-related

21   newsletters.  Red Rock also advertised in particular media sources, including a media

22   source that provided retirement and TSP-related information to active and retired

23   federal employees and military service members.  Red Rock even created guidebooks

24   that discussed TSPs, IRAs, and other securities accounts, which Red Rock provided

25   to prospective clients holding securities accounts.

26         17.    Red Rock thus targeted investors holding retirement accounts.  As stated

27   in an August 7, 2020 email from a Red Rock employee to a potential provider of

28   advertising space, the company's target demographic was "Right Wing

COMPLAINT             5

Conservative[,] 59+ years of age[,] male & female[,] Interest in retirement/investments[,] Owns a 401(k)/IRA[,]" and "anyone who works for the government and own [sic] a Thrift Savings Plan)[.]"

18.     As stated in an internal Red Rock training document for junior salespeople, created during the Relevant Period, soliciting investors to sell assets from retirement accounts was "Red Rock's bread and butter.  The main thing we do."

19.     And in marketing materials that Red Rock distributed to prospective clients during the Relevant Period, Red Rock stated that using money already in a securities account was "a better way" to buy metal and diversify one's investments than using funds from non-securities savings.

20.     The majority of Red Rock's clients during the Relevant Period did in fact use assets transferred from retirement accounts to a SDIRA to purchase metal from Red Rock, as Red Rock advised them to do.

21.     During the Relevant Period, Kelly supervised Red Rock employees who communicated with clients or prospective clients on a regular basis, including by training employees on what they should say about the company and on transaction confirmation calls.  From in or around 2017 to 2019, Kelly also supervised Red Rock's sales floor.  Further, he had authority over what Red Rock salespeople should say to prospective clients and clients.

22.     Kelly's instructions for salespeople repeatedly emphasized Red Rock's guidance to investors about selling securities from retirement accounts.  For example, on July 13, 2021, Kelly sent an email to Red Rock's salespeople with the subject "How to talk about us…."  Kelly told the salespeople that he had been listening to recordings of their calls with prospective clients and clients, and he provided instructions for what they should say on such calls.

23.     For example, when prospective clients asked what Red Rock does or why they should do business with Red Rock, Kelly instructed the salespeople to respond: "At Red Rock Secured we know that you want to be worry free.  In order to

do that, you need to protect your retirement savings.  The problem is you can wake up and half your retirement could be gone which makes you feel powerless[,]" and "for over a decade [we] have worked with our clients to protect their retirement savings by investing in gold and silver."  Kelly also instructed the salespeople to tell prospective clients that by converting their investments into gold and silver they "can stop worrying about not having enough money and instead know that no matter what happens with the market you are safe and can afford the retirement you earned."

24.     Red Rock employees followed Kelly's instructions, including by regularly adding the following language that he provided to their emails with prospective clients and clients:  "Most people are worried about losing money in their retirement accounts.  At Red Rock Secured we convert that money into physical gold & silver so they can enjoy a worry-free retirement."

25.     Kelly participated in weekly marketing meetings, signed off on marketing spending, and recommended where Red Rock should advertise.  Kelly also had Red Rock hire copywriters to create the Red Rock guidebooks.  Kelly further decided that Red Rock would send guidebooks and other marketing materials to prospective clients that contained his signature or that were sent under his name.

26.     Spencer and Ward contributed information to the drafting of Red Rock guidebooks and sent the guidebooks to prospective clients.  When a prospective client responded to Red Rock's guidebooks and other marketing materials expressing potential interest in purchasing metal, Red Rock salespeople set up a call between the prospective client and a senior sales executive, such as Spencer or Ward, who would inquire as to the nature and amount of the prospective client's existing retirement-account assets and advise them to convert a portion of those assets into metal.

27.     Red Rock salespeople referred prospective clients who expressed interest in transferring retirement account assets to a SDIRA to Red Rock's IRA Services department, of which Ward was the director for several years during the Relevant Period.  Ward and others in Red Rock's IRA Services department assisted

clients with setting up a new SDIRA at a third-party custodian with which Red Rock had a relationship, and with transferring the clients' securities sales proceeds out of their existing retirement account. For example, Red Rock employees provided clients with the paperwork required to transfer assets out of their securities accounts and participated in three-way telephone calls with the TSP, IRA, or 401(k) custodians regarding the funds transfers.

**B.     Defendants Used Often False or Misleading Scare Tactics to Advise Investors to Sell Securities.**

28.     While marketing to retirement-account holders, Red Rock used scare tactics—warning of imminent and serious stock market and economic downturns—to advise prospective clients to take immediate action to move retirement-account assets out of securities and into metal. Red Rock's scare tactics included false and misleading statements made in guidebooks, emails, on its website, and in phone calls.

*1.     The TSP Guidebook*

29.     One example of such marketing was a guidebook that Red Rock provided to prospective clients entitled "The #1 TSP Playbook–Little Known IRA Loopholes for Protecting Your TSP" (the "TSP Playbook").

30.     The TSP Playbook is written in the first person and states "My name is Jeff Ward and I'll be your guide . . ." It then states "Our leadership team, which includes myself, Sean [Kelly] and Tony [Spencer] have worked tirelessly on this project." The "Introduction" section ends with Kelly's signature above his name and title: "Sean Kelly CEO – Red Rock Secured." The end of the TSP Playbook is signed "Jeff Ward and the entire RRS [Red Rock Secured] team." Ward and Spencer contributed information to the drafting the TSP Playbook and both sent it to prospective clients.

31.     The TSP Playbook Introduction begins by questioning "the government's ability to manage funds" and further states the TSP Playbook's goal as showing prospective clients "a possible path for you so that you don't end up living a

minimal existence after a life of [government] service"; and "so that you can instead secure your future no matter how many years that might be…so that you can enjoy the retirement years in comfort and style without the fear of poverty."  The TSP Playbook further warns, "[A]nother market down turn is coming.  It's inevitable, like the tide . . . your TSP's total value is tied to whatever market you're in."

32.     The TSP Playbook contained multiple false and misleading statements concerning the investment options available to TSP investors.  In its overall message, and in specific false and misleading statements and material omissions, the TSP Playbook created a false and misleading impression that all TSP investments are tied to the "stock market" and, thus, rise and fall with the "stock market."

33.     The TSP Playbook falsely and misleadingly states that with the investment options available within the TSP, "you are, in a sense, putting all of your eggs into one basket.  Sure, there are six funds to choose from . . . but they're all stock market funds."  It further states that the TSP is "entirely tied into a single market, or a single type of market, at least.  And that market is the stock market."

34.     The TSP Playbook omits, however, that certain investment options available in the TSP were not a "stock market fund."  For example, according to the government's TSP "Fund Information" booklet,[1]  the TSP "G Fund" invests only in "nonmarketable U.S. Treasury securities specially issued to the TSP."

35.     In addition, the TSP Playbook describes the TSP "L Fund" as "invest[ed] in all of the other [TSP] funds" and as taking "into account how many years you have left until retirement and how much risk you want to take," but omits the material information that the L Fund regularly "rebalances" the mix of the five TSP funds and reduces over time the TSP account holder's exposure to the TSP's stock funds (the C, S, and I Funds) as the account holder nears his or her "target" date (retirement).  Thus, for example, the L Fund's "target date" allocation as of January

---

[1] Available online at www.TSP.gov/publications.

1, 2023 was: 70% in the G Fund, a total of 24% allocated among the three TSP stock funds, and 6% in the F Fund, which invests in an index portfolio that tracks a diversified bond index, not a stock index.

36. The TSP Playbook also omits other material information regarding the TSP G Fund. The TSP Playbook states only that the G Fund is "another fund that's attached to bonds. Treasury bond securities in this case. This fund sets out to keep pace with inflation, which is one of the biggest eaters of your returns . . . . Obviously, the risks with this fund are also associated with changes in the inflation rate."

37. However, the TSP Playbook misleadingly omits that: (i) the "G Fund is invested in short-term U.S. Treasury securities specially issued to the TSP. Payment of principal and interest is guaranteed by the U.S. government"; (ii) the "[TSP] Board's investment in the G Fund is redeemable on any business day with no risk to principal"; (iii) the "value of the G Fund securities does not fluctuate; only the interest rate changes"; and (iv) "[o]ver long periods of time, the G Fund has historically outperformed inflation . . . ."

38. As another example of the TSP Playbook's misleading statements on the risks of the TSP, the TSP Playbook posits the potential downside if "20% of [an investor's] TSP is invested in" a single company that goes out of business. This is materially false and misleading because, such concentration in an investor's TSP would be impossible as none of the investment options, as reflected on the TSP website, contain such high concentrations of any single corporate-issuer stock.

39. The TSP Playbook further misleadingly suggests—in describing a hypothetical postal worker who suffers significant intraday TSP losses at age 60, causing he and his wife to delay their retirement—that TSP investors, including those at or near retirement age, have no other option but to invest solely in "the stock market." This hypothetical is misleading because it fails to include other retirement account investment options (including the TSP G Fund and L Fund) designed to protect investors against stock market downturns.

40.     After creating the misleading impression for TSP investors that the TSP investments will necessarily decline with the stock market or the performance of a single company that goes out of business, the TSP Playbook then advises that the value of metal typically moves in the opposite direction of stock investments.  It states, "if you've moved out of your TSP into a self-directed IRA, you can not only avoid the pain of market crashes, you can profit by them."

41.     The TSP Playbook omits, however, the material fact that moving retirement account assets into a SDIRA to purchase "premium" coins from Red Rock would typically result in the client losing more than half of the transferred retirement account assets to a hefty markup from which Defendants, not the client, profited.

42.     Moreover, the TSP Playbook omits the material fact that the total expense ratio for each TSP investment fund was less than .1% per year during the Relevant Period; an amount that was significantly lower than the sizeable markup charged by Red Rock.

43.     The TSP Playbook also falsely states that Kelly, Spencer, and Ward had "spent countless hours pouring [sic] over pages of Thrift Savings plan rules and regulations so as to make your options clear and easy to understand," when they had not.

### 2.     Marketing Emails

44.     Red Rock's misleading scare tactics concerning stock market performance was also reflected in its marketing emails.  For example, a marketing email repeatedly sent in Kelly's name between at least August 2018 and May 2019 warned that a specific well-known investment firm "just went public saying **we're headed for 'the biggest market selloff in months'**" (emphasis in original).

45.     That statement was misleading.  Red Rock sent most of those emails to its prospective clients months (not "just") after the referenced investment firm had made its stock market prediction, and much had changed in the stock market during the intervening months.  For example, during the approximately 10-month period in

which Red Rock sent the marketing email in Kelly's name, the price of the S&P 500 index switched courses multiple times.  Red Rock and Kelly, however, failed to assess how the market was currently performing or to otherwise ensure that the investment firm's months-old prediction was still accurate.

46.    The same marketing email also warned TSP investors that if the major selloff occurred, "then your six standard fund options will get clobbered and you will lose significant money."  That statement was misleading because it omitted the fact that, as discussed above, one of the six TSP fund options that Red Rock and Kelly were referring to was the TSP G Fund, which holds only specially issued U.S. Treasury bonds whose value "does not fluctuate; only the interest rate changes."

*3.    Red Rock's Website*

47.    During the Relevant Period, Red Rock also published "Real-time Gold Price and Silver Price Charts" on its website that misleadingly indicated to prospective clients and clients that gold and silver historically have always outperformed the S&P 500 and Dow Jones stock indices, when they have not. During the Relevant Period, Kelly told Red Rock employees to refer prospective clients to those price charts, and employees did so, including by providing links to the charts in emails.

48.    The vertical axis on the right-hand side of Red Rock's price charts purported to show return percentages ranging from -250% to 1000%.  However, while the line graphs for gold and silver tracked returns from at least as far back as 1991 forward, the line graphs for the stock index tracked returns only from 2009 forward.  Because the start date differed as between the metal data and the stock index data, Red Rock's price charts misrepresented the relative performance of metal versus the stock index.  A truthful comparison—in which both the metal data and the stock index data was compared over the same holding period of 1991 to 2022— would have shown that the stock indices performed better over the long term than either gold or silver.

### 4. *Phone Calls*

49.     In phone calls, Red Rock employees made similar misleading statements to prospective clients that metal had outperformed stock indices.  In a July 14, 2021 telephone call, for example, Ward told a prospective client who asked about the price of gold and silver that "[o]ver the last 20 years it's outbeaten the S&P and Nasdaq . . . printing of money could stop and that's when the stock market will probably start going down."

50.     Ward's statement was false and misleading because, over the 20 years prior to his statement, the Nasdaq Composite stock index outperformed gold and silver.  It was also misleading because he selectively chose a 20-year holding period, and omitted the fact that over other holding periods, such as 10 or 30 years prior to his statement, the S&P 500 index significantly outperformed both gold and silver.

### C.    Defendants' Investment Advice was Specific and Regularly Provided to Prospective Clients and Clients.

51.     In telling prospective clients and clients that their existing securities investments were at imminent risk, Defendants specifically and repeatedly advised that the way to "protect" against such risk was to convert 10 to 30% of those investments into metal purchased from Red Rock.

52.     For example, in a July 2021 telephone call, Ward advised two prospective clients to move securities investments into precious metal, stating, "You diversify . . . . You're fully vested in the market.  Any dip in that market you're susceptible to . . . . You should never have your eggs in one basket and at the moment you do . . . a portion in metals, 20, 30 percent, that's where you're winning at that point."

53.     Similarly, in a January 2021 telephone call, Spencer stated that the stock market would crash if the country were shut down again due to the pandemic and that if tax cuts were rolled back, the "stock market will drop at least 35 percent."  Spencer stated that "it's important to make sure not all of your eggs are in the same basket."

He continued, "What we typically recommend is a position in metal between 20 to 30 percent of your overall portfolio . . . That 20 to 30 percent has proven throughout history to provide insurance on the other 70 to 80 percent that stays in the market or stays in one way or another connected to the dollar."

54.     From at least March to June 2021, Red Rock repeatedly advised and solicited prospective clients through an email attributed to Kelly with the title "TSPs Don't Have to Be Limiting . . . . Diversify and Protect Your Wealth With New, TAX-FREE Options."  In that email, Red Rock and Kelly advised:

> There's no mistaking the need to diversify your TSP with the ever decreasing value of the dollar, the uncertainty of the stock market, increased taxes and the fallout of the pandemic, the need to protect your investments and savings could not be more obvious.  This is why 1,000s of TSP account holders are turning to time-proven valuable precious metals like Gold and Silver to protect their money.  And why you should consider rolling over portions or parts of your TSP funds into a special form of retirement account known as the 'self-directed' IRA.

55.     On a Red Rock web page entitled "TSP Investment Advice," Red Rock further stated, "Rather than rely on diversification methods that prove to be volatile, choose the better option by investing in gold, silver, platinum, and palladium."

56.     Red Rock's transaction agreement included a "Diversification" section in which the company recommended that metal "constitute no more than 10% - 30% of a well-diversified portfolio."

57.     Spencer and Ward also advised prospective clients of purported advantages of investing in metal as compared to metals-based exchange-traded funds, which are securities.  For example, Spencer described purported tax benefits of investing in coins as compared to capital gains taxes that would be assessed on exchange-traded fund investments.  Ward advised prospective clients that holding a tangible asset such as metal was better than holding an exchange-traded fund, which he called a "paper" asset.

58.     And after clients had purchased metal from Red Rock, Spencer also advised clients again on selling securities, advising them to take distributions from their securities accounts rather than from the SDIRAs that held their metal, citing such factors as the uncertainty of the stock market or the value of the U.S. dollar.

### D.     Defendants Made False and Misleading Statements About Red Rock's Charges.

59.     Red Rock employees, including Spencer and Ward, regularly and misleadingly told prospective clients that the company charges between one and five percent above its cost for "common bullion" assets, including before the clients had sold securities in their retirement account to purchase metal from Red Rock.  While this statement may have been true for certain Red Rock assets, it was materially false regarding Red Rock's "premium" metal.  In fact, Red Rock typically charged an exponentially higher markup (more than 100 percent) above its cost for "premium" coins.

60.     Spencer and Ward knowingly or recklessly made such statements to prospective clients repeatedly, only to convince them later—after they had sold securities and transferred funds from their retirement accounts—to purchase Red Rock's "premium" coins.  Spencer and Ward engaged in this bait and switch despite knowing that they and Red Rock sold far more "premium" coins than "common bullion," and that they personally stood to receive higher commissions–eight percent or more of the client's purchase amount–by selling "premium" coins.

61.     During the Relevant Period, more than 90% of the SDIRA funds that clients used to purchase metal from Red Rock were used to purchase "premium" coins, not "common bullion."

62.     Contrary to their statements to prospective clients, Spencer and Ward knew, at the least, that Red Rock's markup on its "premium" coins was a minimum of 29 percent.  Moreover, the fact that Spencer and Ward received commissions of eight percent or more for selling premium coins further demonstrates that they knew

or recklessly disregarded that Red Rock was charging clients more than the one to five percent markup that they falsely and misleadingly stated to prospective clients.

63.     As an example, in an email dated August 6, 2020, Ward told a prospective client, "Red Rock makes money from the purchase of precious metals. We charge 1-5% above our cost on all our common bullion assets."  Thereafter, in an August 25, 2020 telephone call with that same prospective client, Spencer stated, "[W]e're not a retail shop, we're an investment firm.  So we have a direct relationship with the mints.  We buy our metal in volume and we buy our metal in wholesale and we pass the savings along to you.  We charge anywhere from 1 to 5 percent above our cost on common bullion assets and there are no ongoing, re-occurring management, service or maintenance fees whatsoever."

64.     However, during that same August 25 telephone call, Spencer knew that he was finalizing the prospective client's purchase of "premium" coins, not "common bullion."  Moreover, Spencer's statements were false because, as he knew or was reckless in not knowing, Red Rock did not have a direct relationship with any mint and did not pass along savings to clients.

65.     Soon after prospective clients sold securities to buy metal, Red Rock provided them with a transaction agreement that, similarly, misleadingly indicated that they would pay a maximum of 29 percent above what Red Rock paid for the "premium" metal and that clients could pay as low as four or five percent above what Red Rock paid for "premium" metal.  Though Red Rock, with Kelly's approval, revised the transaction agreement several times over the years, each version it provided to clients through at least June 2022 contained confusing and misleading language concerning Red Rock's charges.

66.     Thus, for example, several versions of Red Rock's transaction agreement misleadingly stated, "The difference between the Purchase Price Client pays for Products under a Purchase Order and the price that Red Rock actually pays for the Products purchased by Client under such Purchase Order is known as the 'spread'

and it is stated as a percentage of the Purchase Price paid by the client." These versions of the transaction agreement went on to quantify the "spread," including by stating that "[t]he spread on Red Rock's premium, semi-numismatic, and numismatic coins typically ranges between 4% and 29%," or "[t]he spread on Red Rock's premium, semi-numismatic, and numismatic coins typically ranges between 5% for CUSIP assets and 29% for Premium/non-CUSIP assets; however, on the rare occasion, this spread may exceed these amounts."

67.     Such statements thus falsely indicated that the difference between the price the client paid for "premium" coins and the price that Red Rock had paid for the "premium" coins was between 4 and 29 percent when, in fact, that difference was almost always above 100 percent, and typically 120 percent or more.

68.     Moreover, each transaction agreement misleadingly indicated that Red Rock clients could pay as low as a 4 or 5 percent markup for "premium" coins when, in fact, the minimum markup Red Rock charged for its premium coins was 60 percent, which was only available for a coin that it very rarely sold.

69.     Red Rock and Kelly thus intended, or recklessly disregarded, that each version of the transaction agreement obfuscate the plain fact that Red Rock almost always charged a markup of over 100 percent, and typically over 120 percent, on its "premium" coins.

### E.     Defendants Made False and Misleading Statements About the Value of "Premium" Coins.

70.     Kelly set the markup for all of the types of metal that Red Rock sold, and he also set the commission rates that employees would earn. This included Kelly agreeing to pay his top salesperson, Spencer, an added 2% commission on top of the standard commission employees stood to earn from the sale of "premium" coins.

71.     Red Rock's sales executives, including Spencer and Ward, primarily recommended that clients purchase a "premium" coin known as the one-half ounce silver Canadian Red-Tailed Hawk coin ("silver Red Tailed Hawk coin"), minted by

1   the Royal Canadian Mint.

2       72.    Of the dozens of types of metals that Red Rock could sell, the silver

3   Red-Tailed Hawk coin had both Red Rock's highest markup (130%) and the highest

4   sales commission rate (8%).  The markup and commission rate gave Red Rock and its

5   employees a strong incentive to sell the silver Red-Tailed Hawk coin, which they did

6   in vast numbers.  Over $40 million of the more than $50 million that clients used

7   from SDIRAs to purchase "premium" coins from Red Rock was used to purchase

8   silver Red Tailed Hawk coins.

9       73.    A California-based metals distributor (the "Metals Distributor") had an

10  exclusive arrangement to purchase silver Red-Tailed Hawk coins from the authorized

11  distributor for the Royal Canadian Mint.  At Kelly's direction, Red Rock, in turn, had

12  an exclusive arrangement with the Metals Distributor to purchase its silver Red-

13  Tailed Hawk coins.

14      74.    As a result, because Red Rock was the only company selling silver Red-

15  Tailed Hawk coins to individual investors, Red Rock controlled the retail market

16  price.

17      75.    Moreover, there was essentially no secondary market for silver Red-

18  Tailed Hawk coins, and Red Rock took steps to avoid the creation of any such

19  market, to avoid others underselling Red Rock and revealing the actual, lower market

20  value of those coins.

21      76.    Thus, for example, on one occasion, on October 28, 2020, when a

22  prospective client found the silver Red-Tailed Hawk coin available for sale from

23  another company, the prospective client asked Spencer, "So, are virtually all half-

24  ounce Red Tailed Hawk coins currently owned by Red Rock or Red Rock clients?  If

25  that is so, would not the price of that coin above its bullion weight at any given time

26  essentially be set by Red Rock?"  Spencer replied, falsely, "The value is set by the

27  mint . . . ."  The prospective client then responded that he could not find the coin on

28  the Royal Canadian Mint's website, but had found it for sale at another Canadian

company at less than half the cost.

77.   Spencer forwarded his email exchange with the prospective client to Kelly, and Kelly in turn forwarded it to the CEO of the Metals Distributor and to Red Rock's head of accounting.  Kelly wrote, "Guys, this is KILLING our deals.  See below….. complete bulshit [sic].  Is there a way we can have the candian [sic] mint reach out to [the Canadian company] and tell them they are selling OUR exclusive coin. [sic]"

78.   On or around October 29, 2020, Kelly told Red Rock's head of accounting that he wanted him to find a way to get the silver Red Tailed Hawk coins off of the Canadian company's website.  Kelly instructed Red Rock's head of accounting to buy all of those coins, which totaled approximately 720 coins, which the head of accounting did.

79.   Red Rock sold more than 1.3 million silver Red Tailed Hawk coins during the Relevant Period.  The fact that Kelly quickly moved to ensure that a tiny fraction of the number of silver Red Tailed Hawk coins sold by Red Rock would no longer appear on the Canadian company's website, shows the extent to which he and Red Rock knew, and made certain, that they, and not the market, set the price of silver Red Tailed Hawk coins.

80.   Consequently, by entering into the exclusive arrangement with the Metals Distributor, and taking steps to ensure that there would be no secondary market for the silver Red Tailed Hawk coins, Red Rock maintained control over the market price of those coins.  Kelly and Red Rock employees, including Spencer, knew that the purported value of such coins was solely being assigned by Red Rock and its employees, and not by any external retail or market demand factors.

81.   Red Rock's practice, as approved by Kelly, was to misleadingly provide—including to clients who asked how much the coins they had purchased were worth—a "retail" value that was not based on the value the client could receive in the market if they sold their coins, but instead was based on what the client would

pay if they were to buy the coins from Red Rock again on the particular day on which Red Rock provided the purported "retail" value.

82.   Red Rock employees, including Spencer and Ward, regularly and misleadingly told prospective clients and clients that its "premium" coins, including the silver Red Tailed Hawk coins, had a retail or market value that was substantially higher than the asset value reported by SDIRA custodians, and higher than the amount the client paid Red Rock to purchase the metal.

83.   In phone calls and written communications, Red Rock employees, including Spencer and Ward, stated that SDIRA custodians underreported the true value of the coins because they only reported the "melt," "spot," or "assessed" value, which was only one component of the asset's value.  They misleadingly stated that factors such as "market demand," "investor demand," "supply and demand" or "scarcity" added to the value of the assets.  Red Rock employees, including Spencer and Ward, told investors to call them for the "retail" value of their "premium" coins.

84.   A Red Rock client call script that Red Rock salespeople used during the Relevant Period falsely and misleadingly stated:

> [T]he melt value is approximately one half of your purchase value on Non-CUSIP assets.  The other half is based upon Non-CUSIP investment values such as the value of comparable assets found through the applicable mint: market demand, investor demand, and supply and demand.  As such, the 'melt value' is not indicative of your asset's true retail/market value.

85.   When telling investors what the purported "retail" value of their investments was, Spencer and Ward told investors that the value reported by SDIRA custodians was only the "assessed" value, not the "retail" value.  Spencer and Ward also advised that the lower "assessed" value was beneficial to the client or prospective client because they would only pay taxes on the "assessed" value and not on the purportedly higher "retail" or "market" value of their investments.

86.   The call script and Spencer's and Ward's statements—which asserted

1    that "market demand," "investor demand," "supply and demand," "scarcity" or other
2    such factors determined the "retail" or "market" value of "premium" coins—were
3    false and misleading because it was Defendants, and not external market factors, that
4    assigned the purportedly higher "retail" or "market" value of the investments.

5           87.    Spencer also falsely and/or misleadingly ascribed specific percentages
6    and dollar amounts to each of several purported demand factors, without having any
7    quantifiable or documented basis for doing so.

8           88.    For example, on July 30, 2021, Spencer falsely told a client that his
9    coins had a "current retail value" of $156,728.89–almost 140% more than Red Rock
10   had paid to acquire the coins just two weeks prior.  Spencer stated, "[h]ere is a
11   breakdown of the data as provided by the Mint" and listed the following values that
12   added up to the purported "current retail value" of $156,728.89:  "Investor Demand:
13   (27%) 42,316.80[;] Supply and Demand: (26%) 40,749.51[;] Market Demand: (25%)
14   39,182.22 [;] Spot: (22%) 34,480.36."

15          89.    Spencer knew or recklessly disregarded that the data that he provided to
16   the client was not provided by any mint, because he did not obtain it from any mint.
17   Moreover, Spencer knew or recklessly disregarded that the percentages and values he
18   listed for the purported "Investor Demand," "Supply and Demand" and "Market
19   Demand" were not based on any quantifiable or external data point and instead were
20   solely assigned by him and Red Rock.

21          90.    Similarly, Ward repeatedly reported "retail value" amounts to clients
22   that were well above the amount reported by SDIRA custodians and the amount paid
23   by Red Rock to obtain the coins that it sold to the clients.  In doing so, Ward told
24   investors in emails that SDIRA custodians reported "melt" value which "is
25   significantly less than the retail value of the product as it fails to factor in variables
26   associated with retail pricing. These variables include pricing for comparable
27   products found on the applicable nation's mint website, scarcity, and supply and
28   demand."  As Ward knew or recklessly disregarded, the purported variables

COMPLAINT                                    21

associated with retail pricing were not based on any quantifiable or external data point and instead were solely assigned by him and Red Rock.

### F. Spencer Made Additional False and Misleading Statements.

91. In emails and telephone calls with clients and prospective clients, Spencer made a litany of additional material false and misleading statements regarding Red Rock's charges and his personal credentials. Spencer often made these statements in conjunction with dire statements that he made about the performance of stock indices or the stock market more generally, and before convincing prospective clients to sell securities to buy "premium" coins from Red Rock.

92. For example, in the same telephone call in which he advised the prospective client discussed above in paragraph 53 to move 20 to 30 percent of their investment portfolio into metal, and cited a potential stock market decline of at least 35 percent, Spencer made false and misleading statements that included that he had a PhD in Economics, International Markets, and that he had worked with clients for over 25 years.

93. Spencer also falsely stated that Red Rock charged a one to five percent fee, and that the prospective client would pay a fee of 1.83% or $1,830 exactly if he transferred $100,000 from his 401(k) account to purchase coins from Red Rock, with the 1.83% fee being offset by 5% in metal that Spencer claimed Red Rock would give the client.

94. Contrary to Spencer's statements, that client, who thereafter paid Red Rock $100,000 (on or around January 18, 2021) to purchase "premium" coins, unwittingly paid a markup or fee of approximately $66,000, while Red Rock used only approximately $44,000 of the investor's $100,000 to acquire the coins.

95. In a May 4, 2021 email, Spencer falsely told another prospective client that Red Rock would charge him only a one-time, 1.83% fee, and that he would receive upwards of 15% in "bonus" metal. On or about July 7, 2021, after receiving this information from Spencer, the client used $150,000 that he had transferred to a

SDIRA to purchase from Red Rock 4,000 silver Red-Tailed Hawk coins.  In reality, as Spencer knew or recklessly disregarded, but unbeknownst to the investor, Red Rock did not charge the investor a 1.83% fee; instead, Red Rock charged the investor a 130% markup, spending only $65,400 to acquire the coins for the investor, and taking the remaining $84,600 as a profit.  As Spencer knew or recklessly disregarded, he had no basis for stating that Red Rock charged a 1.83% one-time fee, or that Red Rock provided clients with upwards of 15% in "bonus" metal.

96.     Spencer often told clients and prospective clients that they would pay a fee of exactly 1.83% to buy metal from Red Rock.  As Spencer knew or recklessly disregarded, such statements were false and misleading because he had no basis for stating that clients paid a 1.83% fee.

97.     Spencer knew that he personally received a commission of as much as 10% of the client's purchase amount and, thus, knew or recklessly disregarded that Red Rock had to be charging clients, at the least, a fee greater than the commission that it paid to him; otherwise, Red Rock would lose money on each such transaction.

98.     Spencer also knowingly or recklessly told clients and prospective clients falsely that Red Rock had a direct or exclusive relationship with mints—through which it passed savings along to the client–and that clients paid "discounted" prices. In fact, while Red Rock had an agreement with the Metals Distributor regarding silver Red Tailed Hawk coins, it had no direct or exclusive relationship with any mint, and it did not pass along savings or discounts to clients from a direct and exclusive arrangement with a mint.  Spencer had no basis for making those false claims.

99.     Spencer told clients and prospective clients that Red Rock offered promotions whereby it provided clients with "bonus" metal of as much as 10 to 15 percent of the total metal purchased by a client.  Such statements were false and misleading because any purported "bonus metal" provided by Red Rock was nowhere near 10 to 15 percent, and Spencer had no basis for stating that Red Rock provided

"bonus" metal in those amounts.

100.   Spencer told clients and prospective clients that he held a PhD in Economics and International Markets.  Also, when transferring telephone calls with clients or prospective clients to Spencer, Red Rock employees referred to Spencer as "Dr. Tony Spencer" and stated that he had a PhD in Economics.  The statements about Spencer having a PhD in Economics and International Markets were false and misleading because he did not hold a PhD in those subjects.

101.   Spencer told clients and prospective clients that he had over 25-years of experience working with clients.  Such statements were false and misleading because as Spencer knew, he had, at most, 11-years of experience.

102.   Spencer told clients and prospective clients that he had converted his TSP account into a precious metals IRA.  Such statements were false and misleading because as Spencer knew, he had not converted his TSP account into a precious metals IRA.

103.   Spencer knew, or recklessly disregarded, that the statements he made to clients and prospective clients, as detailed above, were false and misleading.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**

**(Against All Defendants)**

104.   The SEC alleges and incorporates by reference paragraphs 1 through 103 above.

105.   As more fully described in paragraphs 1 through 103 above, Defendants, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of business

which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.

106. By reason of the foregoing, Defendants violated Section 10(b) of the Exchange Act [15 U.S.C. §78j (b)] and Rule 10b-5 thereunder [17 C.F.R. 240.10b-5].

## SECOND CLAIM FOR RELIEF

### Violations of Advisers Act Sections 206(1) and 206(2)

### (Against All Defendants)

107. As more fully described in paragraphs 1 through 103 above, at all times alleged in this complaint, Defendants, while acting as investment advisers, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully or recklessly:  (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients.

108. By reason of the foregoing, Defendants violated Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## THIRD CLAIM FOR RELIEF

### Aiding & Abetting Violations of Section 10(b) of the Exchange Act, And Exchange Act Rule 10b-5

### (Against Defendants Kelly, Spencer and Ward)

109. The SEC alleges and incorporates by reference paragraphs 1 through 103 above.

110. Red Rock, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of

business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities.  Red Rock knew, or was reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 103 above.

111.   Defendants Kelly, Spencer and Ward knowingly or recklessly provided substantial assistance to Red Rock in its violation of Sections 10(b) of the Exchange Act and Rule 10b-5 thereunder.  Kelly provided substantial assistance in the violations by, among other things, establishing the business model that incentivized Red Rock and its salespeople to steer investors to "premium" coins with misleading claims of "retail" value, creating the transaction agreement that contained misleading information about Red Rock's charges, establishing the hefty markups that Red Rock charged for "premium" coins that far exceeded the markups disclosed to investors, and deciding that Red Rock would disseminate scare tactic marketing materials that encouraged the sale of securities and purchase of metal from Red Rock and included false and misleading statements.  Spencer and Ward provided substantial assistance in the violations by, among other things making false and misleading statements to clients and prospective clients regarding Red Rock's charges and various other aspects of its business, and by contributing to and sending the misleading TSP Playbook to prospective clients, as detailed above.  Kelly, Spencer and Ward knew or recklessly disregarded that Red Rock was committing violations, and they had a role in furthering them.

112.   By engaging in the conduct described above, Kelly, Spencer and Ward aided and abetted violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j (b)], and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5(a) and (c)].

### FOURTH CLAIM FOR RELIEF
### Aiding & Abetting Violations of Advisers Act Sections 206(1) and 206(2)
### (against Defendants Kelly, Spencer and Ward)

113.   The SEC realleges and incorporates by reference paragraphs 1 through

103 above.

114.   As more fully described in paragraphs 1 through 103 above, at all times alleged in this complaint, defendant Red Rock, while acting as an investment adviser, by use of the mails, and the means and instrumentalities of interstate commerce, directly or indirectly, knowingly, willfully or recklessly:  (i) employed devices, schemes or artifices to defraud its clients or prospective clients; and (ii) engaged in transactions, practices and courses of business which have operated as a fraud or deceit upon its clients or prospective clients.  By reason of the foregoing, Red Rock has violated Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

115.   Kelly, Spencer and Ward knowingly or recklessly provided substantial assistance to Red Rock in its violation of Sections 206(1) and 206(2) of the Advisers Act.

116.   By engaging in the conduct described above, Kelly, Spencer and Ward aided and abetted violations of Sections 206(1) and 206(2) of the Advisers Act. [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

## FIFTH CLAIM FOR RELIEF

**Control Person Liability for Violations of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**

**(against Defendant Kelly)**

117.   The SEC realleges and incorporates by reference paragraphs 1 through 103 above.

118.   Red Rock, in connection with the purchase and sale of securities, by the use of the means and instrumentalities of interstate commerce and by the use of the mails, directly and indirectly:  used and employed devices, schemes and artifices to defraud; made untrue statements of material fact and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and engaged in acts, practices and courses of

business which operated or would have operated as a fraud and deceit upon purchasers and sellers and prospective purchasers and sellers of securities. Red Rock knew, or was reckless in not knowing, of the facts and circumstances described in paragraphs 1 through 103 above.

119.   When Red Rock violated Section 10(b) of the Exchange Act and Rule 10b-5, Kelly directly or indirectly controlled Red Rock.  Kelly was therefore a "controlling person" within the meaning of Section 20(a) of the Exchange Act [15 U.S.C. § 78t(a)] with regard to Red Rock.

120.   As alleged above, Kelly was a culpable participant in, and directly or indirectly induced the acts constituting Red Rock's violations of the Exchange Act, and did not act in good faith.

121.   By reason of the foregoing, Kelly is jointly and severally liable with and to the same extent as Red Rock for its violations of Section 10(b) of the Exchange Act and Rule 10b-5 and, unless enjoined, will again act as a "controlling person" in connection with such violations.

## RELIEF REQUESTED

WHEREFORE, the Commission respectfully requests that this Court:

### I.

Permanently enjoin defendants, their officers, agents, servants, employees, attorneys and those persons in active concert or participation with defendants who receive actual notice of the order of this Court, by personal service or otherwise, and each of them from, directly or indirectly, engaging in the transactions, acts, practices or courses of business described above, or in conduct of similar purport and object, in violation of Section 10(b) of the Exchange Act [15 U.S.C. § 78j] and Rule 10b-5 [17 CFR § 240.10b-5] thereunder, and Sections 206(1) and 206(2) of the Advisers Act [15 U.S.C. §§ 80b-6(1) and 80b-6(2)].

### II.

Order defendants to disgorge the ill-gotten gains received because of the

violations alleged in this Complaint, including prejudgment interest, pursuant to Section 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5), and 78u(d)(7)].

### III.

Order defendants to pay civil penalties pursuant to Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)], and Section 209(e) of the Advisers Act [15 U.S.C. § 80b-9(e)].

### IV.

Order that Kelly be permanently prohibited from serving as an officer or director of a public company, pursuant to Section 21(d) of the Securities Exchange Act of 1934, 15 U.S.C. § 78u(d)(2).

### JURY DEMAND

The Commission hereby requests a trial by jury.

Dated:  May 15, 2023

/s/ Stephen Kam
Stephen Kam
Attorney for Plaintiff
Securities and Exchange Commission
Jack Kaufman
Michael Ellis
*Pro Hac Vice Applications Pending*

Of Counsel:
Antonia M. Apps
Tejal D. Shah
Hane L. Kim
SECURITIES AND EXCHANGE COMMISSION