Michael V Schafler (Bar No. 212164)
Email: mschafler@cohen-williams.com
Marc S. Williams (Bar No. 198913)
Email: mwilliams@cohen-williams.com
Brittany L. Lane (Bar No. 323440)
Email: blane@cohen-williams.com
COHEN WILLIAMS LLP
724 South Spring Street, 9th Floor
Los Angeles, CA 90014
Telephone: (213) 232-5160
Facsimile: (213) 232-5167

Attorneys for Defendant Sean Kelly


Joseph Costa (Bar No. 130131)
Email: joseph.costa@costalaw.com
COSTALAW
17383 Sunset Blvd, Ste A-430
Pacific Palisades, CA 90272
Telephone: (310) 394-6611
Facsimile: (310) 394-6612

Attorneys for Defendant Red Rock Secured, LLC

# UNITED STATES DISTRICT COURT

# CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>            Plaintiff,<br><br>      v.<br><br>RED ROCK SECURED, LLC, SEAN KELLY, ANTHONY SPENCER, AND JEFFREY WARD,<br><br>            Defendants. | Case No. 2:23-cv-03682-RGK (PVCx)<br><br>Assigned to Hon. R. Gary Klausner<br><br>**DEFENDANTS SEAN KELLY AND RED ROCK SECURED, LLC'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>NEW REDACTED COPY FILED PURSUANT TO ORDERS OF THE COURT DATED 3/14/24 (DKT NO. 108) AND 3/19/24 (DKT NO. 115)<br><br>Date:          April 1, 2024<br>Time:          9:00 a.m.<br>Courtroom:     850<br>Complaint Filed: May 15, 2023<br>Trial Date:    May 14, 2024 |

# TABLE OF CONTENTS

I.    INTRODUCTION ..................................................................................1

II.   THE SEC HAS FAILED TO ESTABLISH A PRIMARY VIOLATION ..................3

    A.    The Court Should Not Consider the Motions Against Spencer and Ward for Violation of the Order on Page Limits ...............................3

    B.    The Court Should Not Consider the Motions Against Spencer and Ward for Violation of the Order Barring Multiple Summary Judgment Motions..................................................................................4

    C.    The Claimed Violations Are Not Subject to the Securities Laws...................4

III.  TRIABLE ISSUES FORECLOSE SUMMARY JUDGMENT AGAINST KELLY ON THE AIDING AND ABETTING CLAIMS ...........................5

    A.    Applicable Law on Aiding and Abetting Securities Fraud ...........................5

    B.    The Claim that Kelly Aided and Abetted Violations of the Advisers Act ...........................................................................................6

        1.    There Are Triable Issues on Whether Kelly Substantially Assisted in Violations of the Advisers Act...........................6

        2.    There Are Triable Issues on Whether Kelly Knew or Recklessly Disregarded Violations of the Advisers Act and His Alleged Role ...........................................................8

    C.    The Claim that Kelly Aided and Abetted Violations of the Exchange Act/Rule 10b-5 ...................................................................9

        1.    There Are Triable Issues on Whether Kelly Substantially Assisted in Violations of the Exchange Act/Rule 10b-5 ....................9

            a.    *Whether Kelly directed salespersons to mislead customers about a 1%-5% markup on RTH coins is disputed*...................................................................10

            b.    *There is nothing unlawful in charging large markups* ............11

            c.    *Whether it was misleading to market RTH coins as premium products is disputed*..................................11

COHEN WILLIAMS LLP

i

       *d.*     *Whether the Transaction Agreement and confirmation call script were misleading is disputed* ....................................16

      2.     There Are Triable Issues on Whether Kelly Knew or Recklessly Disregarded Violations of the Exchange Act/Rule 10b-5 and His Alleged Role .........................................................................16

IV.  TRIABLE ISSUES FORECLOSE SUMMARY JUDGMENT AGAINST KELLY ON THE CONTROL PERSON LIABILITY CLAIM .............................18

    A.    There Are Triable Issues on Kelly's Good Faith Defense .............................18

    B.    There Are Triable Issues on Whether Kelly Induced the Alleged Violations of the Exchange Act .......................................................19

V.   MORE TIME IS NEEDED TO DEPOSE THE SEC'S EXPERT ...........................19

VI.  CONCLUSION...................................................................................20

COHEN WILLIAMS LLP

KELLY AND RED ROCK'S OPPOSITION TO SEC'S MOTION FOR PARTIAL SUMMARY JUDGMENT

# TABLE OF AUTHORITIES

**Cases**

*Aldini AG v. Silvaco, Inc.,*
    2023 WL 3749792 (N.D. Cal. Mar. 27, 2023) .................................................3

*Attia v. Google LLC,*
    2018 WL 2971049 (N.D. Cal. June 13, 2018)...............................................3

*Calence, LLC v. Dimension Data Holdings, PLC,*
    222 F.App'x 563 (9th Cir. 2007) ....................................................................3

*Levine v. Diamanthuset, Inc.,*
    950 F.2d 1478 (9th Cir. 1991) ........................................................................5

*No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West*
    *Holding Corp.,*
    320 F.3d 920 (9th Cir. 2003) ........................................................................18

*Pinkerton Tobacco Co., LP v. Kretek Int'l, Inc.,*
    2022 WL 17224677 (C.D. Cal. Oct. 27, 2022) ............................................3

*Ponce v. SEC,*
    345 F.3d 722 (9th Cir. 2003) ..........................................................................5

*SEC v. Hurd,*
    2014 WL 12561073 (C.D. Cal. Feb. 21, 2014) ............................................6

*SEC v. Premier Holding Corp.,*
    No. 2019 WL 8167920 (C.D. Cal. Dec. 10, 2019).....................................5, 9

*SEC v. Sripetch,*
    2020 WL 6396927 (S.D. Cal. Nov. 2, 2020)................................................6

*Swanson v. U.S. Forest Serv.,*
    87 F.3d 339 (9th Cir. 1996) ............................................................................3

*U.S. v. Regensberg,*
    635 F.Supp.2d 306 (S.D.N.Y. 2009) .............................................................4

*Williams v. County of Alameda,*
    26 F.Supp.3d 925 (N.D. Cal. 2014) ...............................................................3

*Woolfson v. Conn Appliances, Inc.,*
    2022 WL 3139522 (N.D. Cal. Aug. 5, 2022) ...............................................3

**Statutes**

15 U.S.C. § 78j(b) ...............................................................................................*passim*

15 U.S.C. § 78t(a) ..........................................................................................1, 18

15 U.S.C. § 80b-6(1) .........................................................................................*passim*

15 U.S.C. § 80b-6(2) ................................................................................ *passim*

17 C.F.R. 240.10b-5 ................................................................................ *passim*

**Other Authorities**

H.R. 6149 ................................................................................ 11, 17, 18

**Rules**

Fed. R. Civ. P. 56 ................................................................................ 4

COHEN WILLIAMS LLP

## I.   **INTRODUCTION**

Through its Motion for Partial Summary Judgment (Dkt. 86), the SEC asks this Court to determine the classification and value of a unique precious metals asset as a matter of law and find fraud against Defendant Sean Kelly because Defendant Red Rock Secured, LLC ("Red Rock") allegedly charged too much for certain precious metal coins without disclosing their markup.  The SEC seeks to usurp the role of Congress, which refused to require metals companies to disclose their markups, and judicially codify its own judgment as to the classification and value of the coins.  But the SEC's motion collapses under its own weight: the SEC has not established a primary violation of the securities laws or any of theories of secondary liability upon which it seeks summary judgment against Red Rock and its CEO, Kelly.

Although the operative First Amended Complaint asserts claims against Red Rock and Kelly for (1) Violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Exchange Act Rule 10b-5 (First Claim), and (2) Violations of Sections 206(1) and 206(2) of the Investment Advisers Act ("Advisers Act") (Second Claim), the SEC's motion for summary judgment only seeks to hold Red Rock liable on those claims – not Kelly.  (Dkts. 37; 86.)  The SEC moves for summary judgment against Kelly based solely on Red Rock's alleged violations under two theories of secondary liability: (1) aiding and abetting (Third and Fourth Claims), and (2) control person liability under Section 20(a) of the Exchange Act (Fifth Claim).  (*Id.*)

The SEC's motion must be denied, first, because the SEC has failed to establish a violation of the securities laws by Red Rock.  The SEC relies solely on the *respondeat superior* doctrine, citing alleged violations by only two out of more than 100 former Red Rock employees: Defendants Anthony Spencer and Jeffrey Ward.  Yet the SEC fails to identify, let alone establish, a violation by either Spencer or Ward in its motion against Red Rock and Kelly.  (*See* Dkt 86-1.)  Rather, the SEC improperly relies on separately-filed motions for summary judgment against Spencer and Ward to attempt to prove their violations, and then summarily concludes that the two violated securities laws in the

1 present motion. This maneuver violates the page limits set by this Court's Standing
2 Order (Dkt. 19 at 3:21-22) and runs afoul of the Standing Order's stricture that no party
3 may file more than one summary judgment motion (*id.* at 5:1-4). The Court thus should
4 not consider the separately-filed motions against Spencer and Ward when ruling on this
5 motion, in which case there is no basis for summary judgment against Red Rock or Kelly
6 because all claims against them fail in the absence of evidence of a primary violation by
7 Spencer and Ward.

8        Aside from this fatal defect, the SEC's motion against Kelly must be denied
9 because there are factual disputes as to both theories of secondary liability against him.
10 As discussed below, on the aiding and abetting claims, the SEC cites no instance where it
11 is undisputed that Kelly knowingly or recklessly provided substantial assistance in the
12 alleged violations by Spencer and Ward. Rather, the evidence shows Kelly acted in good
13 faith, which also bars summary judgment on control person liability.

14        The SEC's case against Kelly has none of the typical badges of fraud. Kelly relied
15 on specific legislative history from Congress; he mandated all calls between customers
16 and Red Rock be recorded for compliance reasons; he regularly employed legal counsel
17 to advise on compliance; and he decided approximately two years ago to voluntarily
18 disclose Red Rock's markups once a settlement was reached between another precious
19 metals company (Lear Capital) and government agencies. Certainly, Kelly cannot have
20 acted with scienter by not disclosing markups when Congress rejected a disclosure
21 requirement as an unfair limitation on private business – unfair, because the U.S. Mint
22 sells similar assets at large markups and does not disclose its markups. It is, perhaps, for
23 these reasons that the SEC's proffered evidence of fraud against Kelly is so lacking and
24 certainly insufficient to establish his liability on summary judgment.[1]

25
26

---

27 [1] Kelly continues to object to proceeding with this action while a federal criminal
28 investigation is pending.

COHEN WILLIAMS LLP

## II.   THE SEC HAS FAILED TO ESTABLISH A PRIMARY VIOLATION

### A. The Court Should Not Consider the Motions Against Spencer and Ward for Violation of the Order on Page Limits

"[T]he incorporation of substantive material by reference is not sanctioned by the federal rules." *Swanson v. U.S. Forest Serv.*, 87 F.3d 339, 345 (9th Cir. 1996).  District courts routinely refuse to consider arguments contained in a separate brief, particularly when doing so would violate page limits.  *See, e.g., Pinkerton Tobacco Co., LP v. Kretek Int'l, Inc.*, 2022 WL 17224677, at *2 (C.D. Cal. Oct. 27, 2022) ("Kretek also purports to adopt Modoral's arguments in its summary judgment motion in the Modoral Action. This attempt to evade the page limit in this action is improper, even apart from the fact that the summary judgment records in the two cases are not identical.  To the extent Kretek's summary judgment motion simply adopts arguments from the Modoral Action, it is DENIED.") (cleaned up); *Williams v. County of Alameda*, 26 F.Supp.3d 925, 947 (N.D. Cal. 2014); *Aldini AG v. Silvaco, Inc.*, 2023 WL 3749792, at *3 (N.D. Cal. Mar. 27, 2023); *Woolfson v. Conn Appliances, Inc.*, 2022 WL 3139522, at *6 (N.D. Cal. Aug. 5, 2022); *Attia v. Google LLC*, 2018 WL 2971049, at *16 (N.D. Cal. June 13, 2018).  Where district courts refuse to consider arguments in a separate brief, the Ninth Circuit has affirmed.  *See Swanson*, 87 F.3d at 345; *Calence, LLC v. Dimension Data Holdings, PLC*, 222 F.App'x 563, 566 (9th Cir. 2007).

In its motion against Kelly and Red Rock, the SEC fails to discuss the alleged securities laws violations by Spencer and Ward.  The Memorandum against Kelly and Red Rock is 20 pages.  It does not include any points or authorities supporting the claim that Spencer and Ward violated the Exchange Act/Rule 10b-5 or the Advisers Act. Nowhere does the SEC set forth the elements of the alleged violations or state which facts, supported by which evidence, establish each element.[2]  Instead, to establish the

---

[2] Without this, Red Rock cannot address whether the conduct of Spencer and Ward was "within the scope of their authority," as is required.  (*See* Dkt. 86-1 at 17:27-18:5.)

COHEN WILLIAMS LLP

1  underlying violations, the motion relies only on the separately-filed motions for summary
2  judgment against Spencer and Ward, incorporating an additional 40 pages of argument.
3  (Dkts. 86-1 at 17:21-26; 82-1; 83-1.)  This tactic violates the 20-page limit for
4  Memoranda under the Standing Order.  (Dkt. 19 at 3:21-22.)  The Court should not
5  consider the SEC's wholesale incorporation by reference of the entirety of the motions
6  against Spencer and Ward, in which case the SEC has failed to establish a primary
7  violation of the securities laws.  Without a primary violation, the SEC concedes that the
8  motion against Red Rock and Kelly – which is based entirely on theories of secondary
9  liability) – must be denied.  (Dkt. 86-1 at 17:20 – 18:27, 22:22-25.)[3]

10      **B. The Court Should Not Consider the Motions Against Spencer and Ward**
11          **for Violation of the Order Barring Multiple Summary Judgment Motions**
12          Section 6 of the Standing Order states: "Without prior permission from the Court,
13  no party may file more than one motion pursuant to Fed. R. Civ. P. 56 regardless of
14  whether such motion is denominated as a motion for summary judgment or summary
15  adjudication."  (Dkt. 19 at 4:1-4.)  The SEC violated Section 6 by filing three summary
16  judgment motions without permission.  (Dkts. 82; 83; 86.)  The Court should deny the
17  SEC's motion for failure to comply with Section 6 of the Standing Order.

18      **C. The Claimed Violations Are Not Subject to the Securities Laws**
19          The SEC fails to establish any violation of the Exchange Act was "in connection
20  with" the sale of securities.  The only evidence to that effect is the declaration of the
21  SEC's expert (Dkt. 82-4; 83-4), which lacks foundation and is improper expert opinion.
22  Nor has the SEC established that any defendant acted as an "investment adviser" under
23  the Advisers Act, as there is no evidence that they were paid for investment advice, only
24  for the sale of precious metals.  *Cf. U.S. v. Regensberg*, 635 F.Supp.2d 306, 311-12
25  (S.D.N.Y. 2009) (finding that, although defendant discussed "comparative risks between"
26
27  _____
28  [3] If the Court separately denies the motions against Spencer and Ward, there is no
    primary liability, and it must deny the motion against Kelly and Red Rock.

COHEN WILLIAMS LLP

1 products, he was not an investment adviser because he was not compensated *for* such

2 advice, but rather received a percentage of investors' profits).

3 **III.  TRIABLE ISSUES FORECLOSE SUMMARY JUDGMENT AGAINST**

4 **KELLY ON THE AIDING AND ABETTING CLAIMS**

5 Even if the Court finds a primary violation of the Exchange Act/Rule 10b-5 or the

6 Advisers Act, it still should deny summary judgment against Kelly for aiding and

7 abetting the violations. First, it is entirely unclear from the motion against Kelly what

8 exactly the SEC contends are the violations by Spencer and Ward, and thus Red Rock,

9 for which Kelly should be held liable. There is no discussion identifying their violations

10 or the undisputed facts that establish each element of the violations. The Court should

11 deny the motion on the aiding and abetting claims for this reason alone.

12 Although utterly unclear, the SEC apparently accuses Kelly of aiding and abetting

13 violations of (A) the Advisers Act based on a purported scheme to deceive customers into

14 liquidating their securities to buy coins from Red Rock (Dkt. 86-1 at 19:9-10), and (B)

15 the Exchange Act/Rule 10b-5 based on a purported scheme to trick customers into

16 believing they were paying a small markup to purchase "premium" red-tailed hawk

17 ("RTH") coins, when they were paying a large markup for what really are "common

18 bullion" coins (Dkt. 86-1 at 20:6-8). Assuming these are the alleged primary violations,

19 and that the SEC can prove them, the Court should deny summary judgment as to Kelly

20 for aiding and abetting because there are disputed issues of fact.

21 **A. Applicable Law on Aiding and Abetting Securities Fraud**

22 To establish a claim for aiding and abetting securities fraud, the SEC must prove:

23 "(1) the existence of an independent primary wrong, (2) actual knowledge or reckless

24 disregard by the alleged aider and abettor of the wrong and of his or her role in furthering

25 it, and (3) substantial assistance in the wrong." *Levine v. Diamanthuset, Inc.*, 950 F.2d

26 1478, 1483 (9th Cir. 1991); *see Ponce v. SEC*, 345 F.3d 722, 737 (9th Cir. 2003). For the

27 second element, a defendant must know of the fraud or recklessly disregard it. *SEC v.*

28 *Premier Holding Corp.*, No. 2019 WL 8167920, at *6 (C.D. Cal. Dec. 10, 2019).

COHEN WILLIAMS LLP

"Aiding and abetting liability cannot rest on the proposition that the person should have known he was assisting violations of the securities laws." *Id.* (cleaned up). "Knowledge or recklessness must be established." *Id.* (cleaned up). "Reckless conduct is a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it." *Id.* (cleaned up). Substantial assistance – the third element – "is met when, based upon all the circumstances surrounding the conduct in question, an individual's actions are a 'substantial causal factor' in bringing about the primary violation." *SEC v. Hurd*, 2014 WL 12561073, at *6 (C.D. Cal. Feb. 21, 2014); *SEC v. Sripetch*, 2020 WL 6396927, at *6 (S.D. Cal. Nov. 2, 2020).

### B. The Claim that Kelly Aided and Abetted Violations of the Advisers Act

#### 1. There Are Triable Issues on Whether Kelly Substantially Assisted in Violations of the Advisers Act

The SEC argues that Kelly substantially assisted Red Rock in deceiving customers into liquidating securities to buy coins, by doing the following:

- Approving the TSP Playbook;
- Allowing Red Rock to send an email in Kelly's name in March 2019, stating that Morgan Stanley "just went public" warning of "market selloff" when Morgan Stanley had made the prediction in August 2018; and
- Causing Red Rock to publish "Price Charts" on its website that suggested silver and gold had consistently outperformed stock indices since 1991.

(Dkt. 86-1 at 19:10-23.) Whether Kelly took these actions is disputed, and, at a minimum, there is a genuine dispute as to whether what he did was a "substantial causal factor" in bringing about primary violations. *Hurd*, 2014 WL 12561073, at *6.

The SEC's own evidence shows that Kelly, *at most*, had an insignificant role in approving the Playbook. While the SEC cites the testimony of Ward as proving that Kelly "was the most senior approver of the Playbook" (Dkt. 86-1 at 10:13-14), Ward's

actual testimony proves otherwise.  Ward testified that "Dave Clement and his marketing team" were the ones at Red Rock "involved in drafting" the Playbook and that "legal counsel" approved the Playbook "for use."  (Dkt. 82-21 at 62:16 – 63:1.)  When the SEC lawyer pressed, Ward again testified, "the last say is normally our legal counsel, I would say, for compliance reasons."  (*Id.* at 63:2-5.)  On the third attempt, the SEC lawyer asked: "Is there anyone – I guess, who's the most senior approver in the chain at the company in terms of approving guides for use?"  (*Id.* at 63:11-13.)  Ward finally responded: "Sean Kelly."  (*Id.* at 63:14.)  But the SEC fails to present any evidence that Kelly was involved in drafting or approving any part of the Playbook, let alone that he drafted, approved, or even was aware of any alleged misleading statements in it.  Indeed, Ward testified a second time that "Marketing" (*i.e.*, "Dave Clement and his marketing team") "has been primarily responsible for determining the content of the guidebooks" (*id.* at 62:16-22, 63:15-18), and that "professional writers" wrote the Playbook (*id.* at 64:6-24).  When asked, again, "who at the company was involved in approving it for use," Ward testified, again, "Legal counsel."  (*Id.* at 65:6-11.)  When the SEC lawyer asked, who, other than legal counsel, approved the Playbook, Ward responded: "Again, marketing, I would say."  (*Id.* at 65:12-15.)  On this evidence, whether Kelly's involvement with the Playbook played any role in a violation, let alone was a substantial causal factor, is plainly disputed.

As to the email about Morgan Stanley, it is inadmissible evidence that lacks foundation and authentication and cannot be relied upon to establish Kelly's liability.  (*See* Objections.)  Nor is there any evidence that Kelly caused anyone to send it.  The SEC concedes as much in alleging that the email was only "sent in Kelly's name," and the email itself is from an unidentified "FEDweek Weekly Newsletter" – not Kelly's Red Rock email address.  (*See* Dkt. 86-2 ¶ 49; Dkt. 86-18.)  Nor is there evidence that anyone read the email, or if they did, whether they (1) purchased anything from Red Rock, (2) were deceived by it, or (3) reasonably could have been deceived by it, given the email is a statement of opinion on how the stock market might perform in the future.  The email

simply does not amount to substantial assistance.  Indeed, the SEC does not reference the email in its motions against Spencer and Ward or explain how it played any role in bringing about a primary violation of the Advisers Act.[4]

Finally, the SEC's own evidence shows that Kelly had "zero" involvement in drafting the Price Charts.  (Dkt. 86-5 at 221:7-9.)[5]  The evidence shows that Red Rock obtained the charts from a vendor and that others in the industry use the same charts.  (*Id.* at 221:7 – 222:1, 225:21 – 226:4, 228:5-19.)  Moreover, the argument that the charts are misleading is a conclusory assertion; there is no evidence anyone was misled or likely to be misled by them.  The jury should decide whether Kelly played a substantial role in publishing the Price Charts and, if so, whether what he did was a "substantial causal factor" in bringing about a violation of the Advisers Act.

2. There Are Triable Issues on Whether Kelly Knew or Recklessly Disregarded Violations of the Advisers Act and His Alleged Role

The SEC acknowledges that the second element of aiding and abetting has two required subparts – actual knowledge or reckless disregard by the alleged aider and abettor (1) "of the wrong," and (2) "of his or her role in furthering" the wrong.  (Dkt. 86-1 at 18:21-22.)  The SEC fails to address the first subpart, and, on that basis the Court must deny the motion on the claim for aiding and abetting violations of the Advisers Act.

There are also triable issues on whether Kelly knew or recklessly disregarded his own role.  The SEC argues that Kelly knew or recklessly disregarded that the Playbook,

[4] The statement by Morgan Stanley, which was only 7 months earlier than the Kelly email, was prescient.  In December 2018, the S&P 500 fell more than 9%, the worst December since 1931.  *See* https://cnb.cx/3GqkaMh.  Setting aside that the concerns raised in the email turned out to be true, it is a classic jury question whether "just went public" is misleading in that context.

[5] The SEC argues that because Kelly exercised his Fifth Amendment rights, he cannot offer his own SEC investigative testimony to oppose summary judgment.  Kelly disagrees, but the Court need not decide this issue because the only investigative testimony by Kelly cited in this Opposition was filed by the SEC with its motion and, in any event, should be allowed under the rule of completeness.  *See* FRE 106.

1   the inadmissible Morgan Stanley email, and the Price Charts "were false or misleading."

2   (Dkt. 86-1 at 19:24-25.)  But the assertion that he "knew" – because he read "widely-

3   available public information that demonstrated the false or misleading nature of these

4   statements" (Dkt. 86-1 at 19:25 – 20:1) – is pure conjecture.  There is no evidence that

5   Kelly read any such "public information."

6      The SEC's own evidence also precludes finding Kelly was reckless as a matter of

7   law.  Engaging legal counsel to review the Playbook is hardly reckless.  (Dkt. 82-21 at

8   62:16 – 63:5, 65:6-11.)  Nor is quoting an actual statement by Morgan Stanley – which

9   proved true – in an email sent 7 months after the statement was made.  At most, it is

10   "inexcusable neglect."  *Premier Holding Corp.*, 2019 WL 8167920, at *6.  Given the

11   email was a forward-looking opinion on whether the stock market was about to crash, it

12   presented no "danger of misleading" customers that was either "known" to Kelly –

13   assuming he had any involvement with the email – or "so obvious that [he] must have

14   been aware of it."  *Id.* (cleaned up).  The SEC does not contend that Kelly sent the email,

15   and there is no evidence he approved sending it in March 2019.  Finally, whether Kelly

16   was reckless in posting Price Charts supplied by a vendor and used by others in the

17   industry is at best disputed.  (Dkt. 86-5 at 221:7 – 222:1, 225:21 – 226:4, 228:5-19.)

18     **C. The Claim that Kelly Aided and Abetted Violations of the Exchange**

19        **Act/Rule 10b-5**

20        1. <u>There Are Triable Issues on Whether Kelly Substantially Assisted in</u>

21           <u>Violations of the Exchange Act/Rule 10b-5</u>

22      In support of the claim that Kelly aided and abetted a scheme to mislead customers

23   into believing they were paying a small markup above Red Rock's cost to purchase

24   "premium" RTH coins, the SEC asserts that Kelly:

25      •   directed salespersons to mislead customers into believing that Red Rock

26        charged only a 1%-5% markup on RTH coins (Dkt. 86-1 at 20:15-19);

27      •   caused Red Rock to charge large markups on RTH coins (*id.* at 20:9-10);

28      •   approved Red Rock's marketing of RTH coins as "limited quantity," "premium

9

COHEN WILLIAMS LLP

1   assets," when the coins in fact are "common bullion" (*id.* at 20:12-16); and

2   • approved misleading language in Red Rock's Transaction Agreement and

3   confirmation call script (*id.* at 21:2-5).

4   Whether Kelly took these actions, and whether what he did was a substantial

5   causal factor in bringing about alleged primary violations, is disputed.

6   ### a. Whether Kelly directed salespersons to mislead customers about

7   ### a 1%-5% markup on RTH coins is disputed

8   The SEC proffers only the Declaration of Ali Nassery in support of this assertion.

9   (Dkt. 86-1 at 14:15-18.)  The declaration, which is four paragraphs on one page, is weak

10  and disputed.  It was signed by "a salesperson" who only worked at Red Rock "for over a

11  month" in 2020.  (Dkt. 86-41 ¶1.)  Somehow, he recalls that nearly four years ago, during

12  his one month at Red Rock, Kelly stated that "if any potential Red Rock customer asked

13  [him] about the prices that Red Rock charged for precious metals, [he] should tell them

14  that Red Rock charges 1-2% over its cost on common bullion assets."  (*Id.* ¶2.)  The

15  Nassery Declaration lacks any details on where or when Kelly supposedly made this

16  statement and in what context.

17  Kelly disputes making this statement or suggesting that people coax customers to

18  believe the markup on RTH coins was 1-2%.  While Red Rock did charge a small

19  markup on common bullion assets, Kelly testified he never discussed markups with

20  salespeople until recently when Red Rock started disclosing 130% markups to customers.

21  (Dkt. 86-5 at 247:5-18.)  No other employee – not Spencer or Ward – testified that Kelly

22  directed them to tell customers Red Rock charges a small percentage over cost on

23  common bullion assets if asked about Red Rock's pricing.  The alleged statement is also

24  inconsistent with the evidence.  (*See* Dkt. 82-4 at ¶14 [128 recorded calls stated that "Red

25  Rock charges 1%-5% above its cost on common bullion assets," not 1%-2%, and noting

26  that Spencer and Ward were the salespeople on 111 of these calls].)

27  Also, the SEC does not allege, and has not submitted any evidence, that Red Rock

28  did not actually charge 1%-5%, or even 1%-2%, on assets that it classified as common

10

1   bullion.  And Nassery does not state that he asked Kelly what to tell customers who ask

2   about pricing on coins Red Rock classified as *premium*, like the RTH.  Instead, Nassery

3   allegedly asked *Ward*, who told Nassery to "transfer the call to him if the customer asked

4   additional questions about Red Rock's pricing."  (Dkt. 86-41 ¶4.)

5                        ***b.  There is nothing unlawful in charging large markups***

6          The SEC does not cite any law against charging large markups or requiring metals

7   retailers to disclose markups.  Congress had the chance to enact law requiring metals

8   retailers to disclose markups and declined to act.  In 2010, a Congressional subcommittee

9   debated the proposed Precious Metal Disclosure Act, which would have required metals

10  dealers to disclose the purchase price, fees, melt value, and the reasonable resale value of

11  coins or bullion.  (RJN #1.)  At the hearing, Howard Beales, the former Director of the

12  FTC's Bureau of Consumer Protection, testified against the bill, which he described as

13  "essentially requir[ing] disclosures to reveal the seller's markup on the product."  (RJN

14  #2 at 33, 35.)  Congressman Ed Whitfield also highlighted the inequity of requiring

15  private dealers to disclose markups when the U.S. Mint does not disclose its own.  (RJN

16  #2 at 15, 16.)  The Act stalled in committee.  (RJN #3.)  Kelly cannot be liable for aiding

17  and abetting based on Red Rock charging large, undisclosed markups.

18                     ***c.  Whether it was misleading to market RTH coins as premium***

19                              ***products is disputed***

20         The SEC asserts that Kelly "approved Red Rock's marketing of its coins as

21  'limited quantity,' 'premium assets,'" when RTH coins in fact are "common bullion"

22  products.  (Dkt. 86-1 at 20:12-16.)  According to the SEC, "the majority of these coins

23  were not 'premium' items in any respect – they were common bullion coins: coins of

24  unfixed or unlimited mintage with no material value above the value of the metal from

25  which they were manufactured."  (Dkt. 86-1 at 6:16-18.)  Those facts are disputed, and

26  the SEC's claims cannot be decided as a matter of law.  The evidence shows that RTH

27  coins *were* in fact of limited quantity, the distinction between bullion and other coins is

28  fluid and a matter of opinion, pricing and value depend on many factors, and there are

11

1   examples of bullion coins priced far in excess of the value of their precious metal content.

2       A fundamental flaw with the SEC's motion is the false idea that there are defined

3   categories of metals.  This is belied by the testimony of two industry professionals,

4   unaffiliated with Red Rock: David Madge and Lorne Whitmore.  Madge, the CMO of A-

5   Mark Precious Metals, Inc. ("A-Mark") – a publicly traded company and the largest

6   distributor of precious metals in North America – testified that there are no definitive

7   categories of precious metals.  (Williams Exh. A at 15:3-10; *id.* at 21:18-20 [testifying he

8   is "not aware" of "a body out there that's deciding whether or not a coin qualifies as a

9   numismatic coin"].)  Madge noted, from his ***standpoint***, these categories: "small bars and

10  rounds," "bullion coins," "collectible bullion coins," "modern numismatics," and "rare

11  coins."  (*Id.* at 15:10 – 16:14.)  "It's a broad spectrum."  (*Id.* at 16:6.)

12      Madge testified that the main difference between the various categories is the price

13  of the coin itself – not necessarily any other feature.  Specifically, when asked to contrast

14  bullion and numismatic coins, he referred only to the difference in price.  (*Id.* at 22:7-15.)

15  When asked about any "physical difference" between bullion and numismatic coins,

16  Madge referred only to their packaging.  (*Id.* at 22:16 – 23:1.)  Although he described

17  numismatics as being "produced predominantly by national mints," having "a specific

18  mintage," and having "a higher quality and special features associated with them and

19  finishes" (*id.* at 18:25 – 19:9), when the SEC lawyer asked whether "bullion coins

20  typically lack the sort of special finishes, high relief finishes and other characteristics" of

21  numismatics, Madge did not identify any differences.  Instead, he said: "Over the years

22  the bullion coins have adopted certain features to differentiate them from one another.  So

23  they can hold special features as well."  (*Id.* at 23:2-8.)

24      Madge denied there is any specific mintage limit to qualify as a numismatic or

25  collectible bullion coin.  (*Id.* at 19:21 – 20:7 ["I'm not sure you could put a definition to

26  say how many.  Each mint looks at each case and determines what the demand is for that

27  product and sets a mintage accordingly. . . ."]; *id.* at 25:3-21 [testifying when asked about

28  collectible bullion mintage limits: "Sometimes they – they do, and other times it's limited

COHEN WILLIAMS LLP

1  to the number of coins that are produced. . . . Sometimes it's announced at the outset, and

2  other times it's determined by the number of products they can produce.  Over the last

3  three years, typically the supply of precious metals has not been sufficient to meet the

4  demand of precious metals.  And we have seen premiums increase across the board."].)

5       Essentially, Madge testified that the classification of coins is subjective and that

6  "***everybody has their own opinion***."  (*Id.* at 28:21 – 29:11 [when asked about "the

7  difference between a collectible bullion coin and just a bullion coin," testifying: "That's a

8  grayer line, and everybody has their own opinion.  My opinion would be different than

9  others. . . . [W]e might sell it as one thing.  Other people turn it into other things. . . ."].)

10       The concept that coin classifications are fluid and subjective was confirmed by

11  Whitmore, the Managing Director of Sales for Precious Metal Products and Services for

12  the Royal Canadian Mint (the "Mint") – the producer of the RTH coins.  Whitmore

13  testified that there are "various examples" of "premium bullion," and that "it's an

14  imprecise term."  (Williams Exh. B at 80:25 – 81:10.)

15       Red Rock classified RTH coins as premium coins.  They were exclusive coins that

16  were limited in their production to only the number that Red Rock ordered, and they were

17  priced higher than Red Rock's common bullion assets – which Madge testified was the

18  primary difference between common bullion and other coin classifications, such as

19  numismatics.  RTH coins are distinct from most of the Mint's bullion coins.  Unlike RTH

20  coins, most of the Mint's bullion coins, ███████████████, are "██████

21  ████████████████████.  (Williams Exh. B at

22  94:17 – 95:10.)  ***RTH coins, however, were not "*****████████████████

23  ███████*****"*** (*Id.* at 95:11-13.)  The RTH coins were manufactured by the Mint and sold

24  exclusively to A-Mark under an exclusivity agreement.  (Williams Exh. A at 51:25 –

25  52:20.)[6]  In turn, A-Mark sold all of the RTH coins to Bayside Metal Exchange

26  _____

27  [6] The SEC argues that Kelly "substantially participated in Red Rock's fraud by entering into an exclusive RTH supply agreement with Bayside."  (Dkt. 86-1 at 21:6-8.)

28  Exclusive distributors are standard in the industry.  (*See* Williams Exh. A at 91:11-23.)

COHEN **WILLIAMS** LLP

1 ("Bayside), and Bayside sold all of the RTH coins to Red Rock under an exclusivity

2 agreement. (Dkt. 82-8 at ¶52.) In a year, the Mint sells ▮

3 ▮" of the silver Maple Leaf coins. (Williams Exh. B at 94:17 – 96:7.) In 2021 or

4 2022, the Mint sold around 37 million Maple Leaf coins. (Williams Exh. A at 95:20 –

5 96:4.) In total, over multiple years, Red Rock sold less than 2 million RTH coins – a

6 fraction of the Maple Leaf coins. (Dkt. 82-8 ¶¶26, 31-32.)

7      Thus, the SEC's argument that RTH coins were "unfixed" and "unlimited" is

8 belied by the evidence. Indeed, Madge testified: "But I can't say that there wasn't a

9 mintage on it." (Williams Exh. A at 56:19-20.) Eugene Fogel from Bayside testified that

10 Kelly wanted to sell a limited number of RTH coins. (Williams Exh. C at 125:14 –

11 127:7.) That is what ultimately happened. The Mint only made as many coins as Red

12 Rock ordered. (Williams Exh. A at 95:16-19 ["Mint only made as many [RTH] coins as

13 A-Mark ordered']); Dkt. 86-1 at 13:11-13 [A-Mark only ordered as many RTH coins as

14 Red Rock ordered from Bayside].) The SEC fails to cite anything restricting Red Rock –

15 as the exclusive retailer of RTH coins – from establishing its own limits on RTH coins.

16      Whitmore testified that limited mintage correlates with higher value." (Williams

17 Exh. B at 30:24 - 31:14; *see also* Williams Exh. C at 43:16 – 44:3 ["So definitely, the

18 lower the mintage, that could make the premium higher."].) Madge testified "it's a fluid

19 market for premiums," "there's a wide range of factors that go into determining what

20 [the] premium is," and "it's a very fluid market that's ever changing." (Williams Exh. A

21 at 32:10, 32:17-18, 33:3-4.) Fogel testified that premiums are priced based on "supply

22 and demand." (Williams Exh. C at 41:12-20.)

23      For example, silver American Eagles – which Madge considers to be a bullion coin

24 that had "no specific mintage" – "last year on the retail side were selling at $18 or so

25 above the spot price of silver, which would have been in the – say the $20 range."

26 (Williams Exh. A at 33:12-15, 89:5-9.) ▮

27 ▮

28 (*Id.* at 39:8-14; *see also* Williams Exh. C at 32:18 – 33:23, 41:12 – 43:13 [testifying that

1   in 2022, U.S. Mint set $73 price for silver American Eagle one-ounce proof coin when

2   spot price for one ounce of silver was a $19, and coin sold on market for $85].)  "If you

3   look at U.S. Mint pricing, there's a wide range of pricing for those specific products."

4   (Williams Exh. A at 64:19-21.)  Fogel also testified that the Mint had priced a silver coin

5   similar to the RTH at CAN$49.99.  (Williams Exh. C 149:21 – 150:24.)

6       When asked whether RTH coins have features that make them more valuable than

7   standard bullion coins, Madge testified: "That's a very subjective question.  Every coin

8   produced has certain features and benefits associated with it. . . ."  (Williams Exh. A at

9   57:15-20.)  When asked whether RTH coins have features that would make them more

10  valuable than the value of their underlying metal, Madge testified: "That – once again,

11  that's a subjective question.  I don't think I can answer that. . . ."  (*Id.* at 58:8-19.)  Madge

12  testified: "The red-tailed hawk coin is a unique product, and the other products are unique

13  products.  There's a market for each specific product.  Sometimes the demand for one

14  product is higher than it is for another product."  (*Id.* at 63:25 – 64:4.)  With its exclusive

15  right to sell RTH coins, Red Rock was "able to offer something that nobody else has,"

16  which of course "brings with it some cachet."  (Williams Exh. B at 99:2-8.)  In sum, RTH

17  coins were exclusive coins of limited quantity and had their own unique features and

18  benefits, even if they shared features with other bullion coins.  The jury will have to hear

19  the evidence and weigh the facts to decide whether it was misleading for Red Rock to

20  market RTH coins as a premium product.[7]

21

22

23

_____

24  [7] Notably, Red Rock's Transaction Agreement explicitly discloses that "Premium
    Products" are "priced at a premium above the value of the precious metal they contain,"
25  as compared to "Common Bullion Products," which "are priced for the most part in
    accordance with the value of the precious metal they contain."  (Dkts. 86-7 at 2, 5; 86-23
26  at 2, 5.)  The agreement refers to a website with a "comprehensive list of all Premium
    Products Red Rock offers."  (*Id.*)  It is hard to understand how disclosing that a coin is a
27  Premium coin and will thus be priced at a higher premium could be misleading.

28

#### d. *Whether the Transaction Agreement and confirmation call script were misleading is disputed*

Finally, the SEC argues that Kelly approved "misleading" language in (i) the Transaction Agreement indicating that clients would pay between "4% and 29%," and (ii) a confirmation call script "claiming that the coins were worth twice their Melt Value." (Dkt. 86-1 at 21:2-5.) The reference to 4% and 29% is to the "Bid/Ask Spread" not "markup." The term "markup" is not in the versions of the agreement included with the SEC's motion. (Dkts. 86-7; 86-23.) As Kelly testified, "Bid/Ask Spread" refers to the difference between the price the customer pays Red Rock for a product and the price at which Red Rock offers to buy back the product in the future. (Dkt. 86-5 at 248:1-2.) Fogel attested to the same definition. (Williams Exh. C at 38:12 – 39:7.) The agreement even defines "bid" price as the buy-back price. (Dkts. 86-7 at 6; 86-23 at 7; *see also* Fogel at 40:11-21 ["buyback price" is the "bid value"].) "Bid/Ask Spread" informs customers that Red Rock will buy back coins at a "bid" price that is 4%-29% less than what customers originally pay; it's not the markup.

As for the call script, whether it is misleading – or it in fact undermines the SEC's claims – is disputed. The script expressly states that the "retail value of your product is different than its melt value," and "melt value is approximately one half of your purchase value." (Dkt. 86-37 at 2.) In other words, the script discloses to customers that they are paying premiums of around 100% over the precious metal content of RTH coins.

### 2. There Are Triable Issues on Whether Kelly Knew or Recklessly Disregarded Violations of the Exchange Act/Rule 10b-5 and His Alleged Role

To support its claim that Kelly knew or recklessly disregarded that customers were misled to believe they were paying a small markup for RTH coins, the SEC relies principally on the assertion discussed above that "Red Rock's 'premium' coins were common bullion assets with no production limitation and no material value in excess of their Intrinsic Value." (Dkt. 86-1 at 21:16-18.) As discussed, this characterization is a

16

COHEN WILLIAMS LLP

disputed issue to be resolved at trial.  The SEC also points to other facts that are disputed
or simply do not show as a matter of law that Kelly had actual knowledge of, or reckless
disregarded, the alleged violations or his own role in them.

*First*, the SEC points to an email that Kelly sent attaching a recording of a call
between Spencer and a customer.  (Dkt. 86-1 at 14:21 – 15:1.)  This email proves
nothing.  The body of the email includes no text.  (Dkt. 86-39.)  The SEC cites no
evidence as to why Kelly sent the email.  There is no evidence that he listened to the call,
which is more than 37 minutes.  (Dkt. 86-40.)  If anything, Red Rock's recording of calls
between salespeople and customers – a practice Kelly adopted at the start of Red Rock's
metals business – shows his good faith, not scienter.  (Dkt. 86-5 at 50:7-19.)

*Second*, the SEC argues that Kelly admitted Red Rock's practices had been
misleading when Red Rock started disclosing its 130% markup to customers after Lear
Capital resolved its case with the NY AG.  (Dkt. 86-1 at 22:11-17.)  This subsequent
remedial measure is inadmissible to prove "culpable conduct."  *See* FRE 407.  And if
anything, it reflects Kelly's good faith effort to comply with the law.  Kelly relied on the
non-passage of the proposed Precious Metal Disclosure Act in not discussing markups
with customers.  (Dkt. 86-5 at 247:1 – 248:6.)  After the Lear case, Red Rock voluntarily
changed its practices to conform with new guidance.  (*Id.*)

*Third*, the SEC points to an instance in which Kelly learned that an online retailer
was selling RTH coins, despite Red Rock's exclusive rights, and Kelly caused Red Rock
to purchase those coins.  (Dkt. 86-1 at 21:11-14.)  There is nothing revealing about Kelly
preserving Red Rock's exclusive rights, which is what Fogel testified he understood to be
the concern.  (Williams Exh. C at 136:20 – 137:19.)

*Finally*, the SEC relies on three customer complaints that Kelly received.  Three
complaints among over 1,000 customers in Red Rock's history (Dkt. 86-5 at 144:5-13)
does not show knowledge of, or reckless disregard for, securities laws violations,
particularly given an abundance of evidence that Kelly acted in good faith as the CEO of
Red Rock.  (*See*, *infra*, Part IV(A).)  As stated by one of those customers, Doug Hutton,

1  who called about a coin other than the RTH, "I don't believe you can have a 100%

2  satisfaction no matter what." (Dkt. 86-40 at 12:10-12:23.)

3  **IV.    TRIABLE ISSUES FORECLOSE SUMMARY JUDGMENT AGAINST**

4  **KELLY ON THE CONTROL PERSON LIABILITY CLAIM**

5       The SEC is not entitled to summary judgment on its control person liability claim

6  because there are triable issues on Kelly's good faith defense – *i.e.*, that Kelly "acted in

7  good faith and did not directly or indirectly induce the act or acts constituting the

8  violation." 15 U.S.C. § 78t(a). To avoid control person liability, "a defendant is entitled

9  to a good faith defense if he can show no scienter and an effective lack of participation."

10 *No. 84 Employer-Teamster Joint Council Pension Trust Fund v. America West Holding*

11 *Corp.*, 320 F.3d 920, 945 (9th Cir. 2003) (cleaned up).

12      **A. There Are Triable Issues on Kelly's Good Faith Defense**

13      As discussed, and as set forth below, the evidence demonstrates that Kelly acted in

14 good faith. *First*, there is no allegation that Red Rock was Kelly's alter ego, funneling

15 consumer money directly to himself. The SEC's evidence shows Red Rock was a real,

16 operating metals business. Kelly was not a sole owner, and he did not operate alone.

17 (Dkt. 86-1 at 7:16 – 9:7.)

18      *Second*, Kelly attempted to conform Red Rock's practices to what he believed

19 were best practices in the industry. He established a compliance department, hired legal

20 counsel, and had counsel review the Transaction Agreements and conduct presentations

21 on compliance to the company. (Dkt. 86-5 at 36:20 – 37:16, 50:7 – 53:22.) He also

22 implemented procedures to voluntarily record sales calls with customers. (*Id.*)

23      *Third*, in early 2022, Kelly required Red Rock to disclose its mark-ups in

24 Transaction Agreements and on customer invoices. (Dkt. 86-1 at 17:6-10.) Though

25 customers were always able to determine the premiums over melt value by looking at the

26 spot price – which is publicly available – Kelly had relied on the non-passage of the

27 Precious Metal Disclosure Act in not discussing markups with customers. (Dkt. 86-5 at

28 247:1 – 248:6.) After the Lear case, Kelly made the decision to be even more

18

1   transparent, while the Mint's pricing remains proprietary.  (Williams Exh. B at 99:9-12.)

2        *Fourth*, Red Rock's pricing was not at odds with industry practice.  Whitmore

3   from the Mint testified that the precious metals industry is a for-profit industry, and that

4   the Mint tries to make a profit.  (Williams Exh. B at 11:11-19, 94:11-16, 102:1-6.)  He

5   further testified that it is common for the Mint to enter into exclusivity arrangements, and

6   that there is value to exclusive coins.  (*Id.* at 94:17-24, 99:2-8.)  Although the SEC takes

7   issue with the pricing of RTH coins, which were limited to the production that Red Rock

8   ordered, the SEC ignores the high mark-ups that the U.S. Mint has charged on bullion

9   coins, including silver American Eagles.  (*See*, *supra*, Part III(C)(1)(c).)

10       *Finally*, no one – including Spencer and Ward – has testified that Kelly told them

11  to make any of the representations that the SEC alleges are misleading.  The SEC's

12  accountant listened to 200 calls, 128 of which included the (true) statement that Red

13  Rock charged 1% to 5% on common bullion products.  (Dkt. 82-4 ¶14.)  Of the 128 calls,

14  111 involved either Spencer or Ward – two of more than 100 salespeople who worked for

15  Red Rock over time.  (*Id.*)  This is hardly evidence of a wide-scale fraud directed by the

16  CEO of the company.

17       **B. There Are Triable Issues on Whether Kelly Induced the Alleged Violations**

18            **of the Exchange Act**

19       Nor did Kelly "induce the act or acts constituting the violation," as evidenced by

20  his good faith.  15 U.S.C. § 78t(a).  Also, as discussed regarding the SEC's allegation that

21  Kelly "substantially assisted" the unspecified alleged violations, his alleged conduct is

22  disputed, and, at a minimum, there is a genuine dispute as to whether he did anything that

23  could amount to inducement of the alleged violations.  (*See*, *supra*, Part III.)

24  **V.   <u>MORE TIME IS NEEDED TO DEPOSE THE SEC'S EXPERT</u>**

25       If the Court is inclined to grant the SEC's motion, Kelly and Red Rock request

26  time under FRCP 56(d) to depose the SEC's experts.  (*See* Williams Decl. ¶9.)

27

28

COHEN WILLIAMS LLP

## VI.  <u>CONCLUSION</u>

For the foregoing reasons, Kelly and Red Rock respectfully submit that the Court must deny the SEC's motion for partial summary judgment against them.


Dated:  March 11, 2024                    Respectfully submitted,

**COHEN WILLIAMS LLP**



By:      */s/ Michael V Schafler*
       Michael V Schafler
       Marc S. Williams
       Brittany L. Lane
       Attorneys for Defendant,
       Sean Kelly

Dated:  March 11, 2024                    Respectfully submitted,

**COSTALAW**



By:      */s/ Joseph Costa*
       Joseph Costa
       Attorneys for Defendant,
       Red Rock Secured, LLC


*The undersigned, counsel of record for Defendant Sean Kelly, attests that all other signatories listed, and on whose behalf this filing is submitted, concur in the filing's content and have authorized the filing.


Dated: March 11, 2024            By:      */s/ Michael V Schafler*
       Michael V Schafler

## **LOCAL RULE 11-6.1 CERTIFICATION**

The undersigned, counsel of record for Defendants Sean Kelly and Red Rock
Secured, LLC, certifies that this brief contains 6,995 words, which complies with the
word limit of L.R. 11-6.1.

Dated:  March 11, 2024                              Respectfully submitted,

                                                    **COHEN WILLIAMS LLP**


                                        By:    _____/s/ Michael V Schafler_____
                                               Michael V Schafler
                                               Marc S. Williams
                                               Brittany L. Lane
                                               Martin J. Cristopher Santos
                                               Attorneys for Defendants
                                               Red Rock Secured, LLC and Sean Kelly